UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

       - v. -                                    :            S1 13 Cr. 682 (KBF)

JOSEPH L. JUNKOVIC                          :

         DEFENDANT.                          :

----------------------------------------------------------------x


# SENTENCING MEMORANDUM


 

Federal Defenders of New York, Inc.
Attorney for Defendant
**Joseph L. Junkovic**
52 Duane Street, 10th Floor
New York, New York  10007
Tel.: (212) 417-8772

**Sarah Baumgartel, Esq.**
Of Counsel


TO:   PREET BHARARA, ESQ.
      United States Attorney
      Southern District of New York
      One St. Andrew's Plaza
      New York, New York  10007
      Attn: **Andrew D. Goldstein, Esq.**
      Assistant United States Attorney

September 2, 2014

Dear Judge Forrest:

I submit this sentencing letter on behalf of Joseph Junkovic in advance of his sentencing scheduled for September 15, 2014. Mr. Junkovic pled guilty to one count of making false statements relating to a health care program, in violation of 18 U.S.C. § 1035, for submitting invoices for payment which overstated the hours that he had worked.

At 49-years old, Mr. Junkovic is facing his first arrest and criminal conviction. He is humiliated and deeply ashamed to be standing before this Court for sentencing. He is a hardworking, service-oriented man and devoted son whose recent years have increasingly centered around the care of his aging parents. He has accepted responsibility for this offense. He is committed to following the law in the future.

This Court must impose a sentence that is sufficient but not greater than necessary to accomplish the statutory aims of sentencing. Prison is not necessary for Mr. Junkovic. He made a serious and foolish mistake which has irreparably stained himself and his family. He does not need a prison sentence to appreciate that he was wrong and that he should never do something like this again. Nor will a period of imprisonment ultimately benefit society or the victim in this case, the New York State Department of Health, since it will delay and inhibit Mr. Junkovic's ability to pay restitution. In light of Mr. Junkovic's history, and the circumstances of this case, we respectfully urge the Court to impose a noncustodial sentence.

## I.   BACKGROUND

Joseph Junkovic was born in the former Yugoslavia in 1965, in an area now known as Montenegro. *See* Draft Presentence Investigation Report (PSR)[1] ¶ 54. He is the only child of Luke and Lula Junkovic. *Id.* Mr. Junkovic's childhood was marked by struggle and trauma. He was born in a desolate mountain region inhabited by only about 160 other families. His family members slept on the second floor of their small house, while their farm animals stayed on the first floor. Joseph was sickly and sustained a skull fracture as a young boy. His mother recounts that his earliest years were spent in and out of the hospital. *See* Letter of Lula Junkovic, attached as ***Exhibit A***. The Junkovics' family home was destroyed by an earthquake in 1969, which also nearly killed Joseph. PSR ¶ 56. His father has often recounted the story of how he pulled the little boy to safety as their house collapsed. *See* Letter of Luke Junkovic, attached as ***Exhibit B***.

Following this earthquake, the family temporarily relocated to Italy. PSR ¶ 56. In 1970, they found passage to the United States with the help of a group of Albanian refugees. *Id.* ¶ 57. Mr. Junkovic became a naturalized citizen of this country in 1985. *Id.* ¶ 58.

---

[1] The parties have not yet received the final presentence report. Defendant submitted several objections and corrections to the draft report.

Re: <u>United States v. Joseph L. Junkovic</u>
    S1 13 Cr. 682 (KBF)

Joseph's parents immigrated to the United States in search of a better life for themselves and their son. It was a relief to be free from the constraints of communism. Luke and Lula are community-oriented, religious, hardworking people, and they sought to instill these values in Joseph. Things were not always easy. Joseph recalls that when they first moved to the Bronx, the most they could afford was a cramped and dirty basement apartment. Luke and Lula worked steadily from the time of their relocation to this country, retiring after decades due to age and health problems. They both continue to be active in their neighborhoods and attend church daily. Mr. Junkovic has lived with his parents his entire life. Today they and some cousins live in a house co-owned by Joseph and his parents, which Joseph's parents bought in 1988. *Id.* ¶ 59.

Like his parents, Joseph has a long history of work and community service. His parents recall that he first began working at around age nine, doing odd jobs, such as dog walking, and selling goods at local street markets. ***Exhibit A***. His father posits that Joseph was inspired to take on responsibility and work from an early age because of his parents' values and their struggles with debt. When Joseph was in high school his father was working maintenance for Montefiore Medical Center in the Bronx, so Joseph also began a regular part-time job there. PSR ¶ 75. He worked at least part-time throughout high school and college, transitioning to full-time work around his third year of college and completely financing his own education. From roughly the time of his graduation through 2012, Mr. Junkovic has worked full-time. *Id.* ¶¶ 70-75.

Although he recognized the value of work, Joseph also strived to improve his education. At first he struggled to speak and write English, but he brought his language skills up to grade level by around age 12 or 13. He graduated from Fordham Preparatory High School in 1982. In 1986 he became the first member of his family to graduate from college, earning a degree in accounting from Fordham University. *Id.* ¶ 68.

As an adult, Mr. Junkovic continued to be actively involved in his community, with the church, charitable organizations and friends. He feels an affinity to Italian, Albanian and other immigrant communities, and respects the call to service of his Catholic faith. Several people who know him, including his parents, longtime friends and his priest, have written to the Court to explain how Joseph has touched their lives.

Joseph's mother notes that he has always been involved in charity and community work, such as helping replace the roof of their local rectory. ***Exhibit A***. Both his father and a longtime friend named Christopher Booth recall how Joseph would assist younger immigrants with school or other paperwork. *See* ***Exhibit B***; Letter of Christopher Booth, attached as ***Exhibit C***. Joseph offered such assistance to Anna Pacitto, who also recalls him organizing broader community service and fundraising events. *See* Letter of Anna Pacitto, attached as ***Exhibit D***. As recounted by his friend Joseph Cipri, Joseph Junkovic helped

Honorable Katherine B. Forrest                                    September 2, 2014
United States District Judge                                                    Page 4

   Re: <u>United States v. Joseph L. Junkovic</u>
       <u>S1 13 Cr. 682 (KBF)</u>

organize several such events, including a service-related trip to New Orleans to work in a hospice for homeless men. *See* Letter of Joseph Cipri, attached as ***Exhibit E***.

   Other friends have written to the Court on Mr. Junkovic's behalf to attest to his general good character. *See* Letter of Father Nikolin Pergjini, attached as ***Exhibit F***; Letter of Salvatore Dileo, attached as ***Exhibit G***; Letter of Biaggio Settembre, attached as ***Exhibit H***; Letter of Howard C. Barshop, attached as ***Exhibit I***. Mr. Junkovic has a caring, warm, optimistic and gregarious nature which comforts and inspires others. To take one example, his mother details how Mr. Junkovic befriended a neighbor's child who suffers from autism, and how Joseph helped draw the child out to speak. ***Exhibit A***. Salvatore Dileo recounts how Joseph comforted him following the death of his father, and how he provided company and solace to a mutual friend dying of cancer. ***Exhibit G***. Father Nikolin Pergjini, who has known Joseph for twenty years, describes him as an honest and hardworking person who always gave generously to the church. ***Exhibit F***. Mr. Junkovic's former colleague Eva Sciandra writes that he is an honorable person, committed to public service. *See* Letter of Eva Sciandra, attached as ***Exhibit J***. She adds that she would trust Joseph with her life.

## II.  THE CURRENT OFFENSE

   Throughout his career, Mr. Junkovic had a particular interest in health-related services. Both his parents worked for Montefiore and that is where Joseph found one of his earliest jobs. He was also inspired to work in this field through his acquaintance and friendship with elderly members of his community, and because of witnessing the health struggles of certain close friends.

   Around twenty years ago, Mr. Junkovic became involved in a program which, with the help of government funding, provided free or low-cost cancer screening services to the poor. Mr. Junkovic recognized that this was critical work. Around 1996, he began helping to administer these free cancer-screening programs: assisting with drafting grant requests for government funding, coordinating payments to doctors and hospitals that provided screenings, completing data entry to track tests and payments, completing required paperwork, and organizing community outreach and education programs to notify people about the free screenings and encourage them to pursue follow-up treatment. Over the years, Mr. Junkovic did this work through his company, JLJ Consulting, and then through a nonprofit organization he founded. He started with a small number of contracts to administer free cancer screenings in conjunction with the Cancer Services Program, but ultimately came to participate in programs in all five boroughs, including work with the American Cancer Society.

   Between 2009 and 2012, the New York Comptroller's Office undertook an audit and review of contracts awarded to CSN. That investigation led to this prosecution. During his participation in the audit, Mr. Junkovic acknowledged that he had not properly kept timesheets for the hours that he was billing under the contracts for the administrative and

Re: <u>United States v. Joseph L. Junkovic</u>
S1 13 Cr. 682 (KBF)

accounting work that he performed. PSR ¶ 25. In fact, during the relevant time period, Mr. Junkovic had treated the approved budget amount for his own compensation as a salary or fee-for-service payment, rather than as a cap for hourly billing. As a result, rather than keeping timesheets and then billing an hourly rate for the work he performed, he submitted "hourly" invoices that were actually just what he believed to be his salary amount divided into hourly increments, assuming a 40-hour week. Thus, even though he was performing the required work, the invoices he submitted were false and he was being overpaid according to the City's policies. The government has calculated that Mr. Junkovic improperly obtained $360,556 through his wrongful actions. *Id.* ¶¶ 4, 33. The City ceased paying Mr. Junkovic and his business ended.

Looking back, Mr. Junkovic regrets his actions. He knows that he made a mistake and wishes that he had acted more conscientiously. He cares deeply about the work of the American Cancer Society and its sister organizations, and the services he was providing. For many years he worked very hard for these programs, building up his company to provide services to more areas. He was passionate about this work and dedicated to helping impoverished communities find the medical treatment they needed. He is truly sorry for having let down all of the wonderful people he worked with and for committing this offense.

Mr. Junkovic was arrested in connection with this case in August 2013. He was released on bail and returned to live with his parents. Despite this pending case, Mr. Junkovic has diligently sought work. He currently provides administrative and bookkeeping services for Beverage Max, a beverage distributor. *Id.* ¶ 69. He also sporadically works for a moving company and as a driver.

## III.  APPLICABLE LEGAL STANDARDS

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera,* 550 F.3d 180, 188 (2d Cir. 2008) (en banc). In reaching its sentencing decision, the Court must consider each of the factors set forth in 18 U.S.C. § 3553(a) to make an individualized sentencing determination. *See Pepper v. United States,* 131 S. Ct. 1229, 1239-40 (2011); *United States v. Booker,* 543 U.S. 220, 245-46 (2005). The Court should begin by calculating the applicable Sentencing Guidelines range. However "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States,* 555 U.S. 350, 352 (2009). Rather than simply deferring to the Guidelines, a sentencing court must make an individualized assessment as to the appropriate sentence based on the facts presented and in light of each of the factors set forth in § 3553(a).

The Court may impose a non-Guidelines sentence based entirely on policy considerations, including disagreements with the Guidelines. *Kimbrough v. United States,* 552 U.S. 85, 101 (2007). This is particularly true when considering Guidelines that are not based

Honorable Katherine B. Forrest                                    September 2, 2014
United States District Judge                                             Page 6

Re: <u>United States v. Joseph L. Junkovic</u>
    S1 13 Cr. 682 (KBF)

on the Sentencing Commission's traditional empirical and experiential study. *See Kimbrough*, 552 U.S. at 109.

Section 3553(a)(2) states that the purposes of sentencing are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

To determine a sentence that best comports with these goals, the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the kinds of sentences available; (3) the kinds of sentence and the sentencing range established in the Sentencing Guidelines; (4) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1), (a)(3)-(7).

First and foremost, the Court should order a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

## IV.  THE ADVISORY SENTENCING GUIDELINES

Mr. Junkovic pled guilty to false statements in connection a health care program, in violation of 18 U.S.C. § 1035. The parties' written plea agreement calculates an advisory Sentencing Guidelines range of 18 to 24 months, based on an offense level of 15 and a criminal history category of I. The PSR calculates the same advisory range. *Id.* ¶¶ 47, 80.

## V.  DISCUSSION

Defendant has no objection to this advisory Guidelines calculation, but asks the Court to impose a noncustodial sentence for a variety of reasons, including that the applicable Guidelines lack sufficient empirical and historical bases, and that the Guidelines fail to take into account virtually anything about the individual being sentenced, or the other statutory sentencing factors. When the Court considers all of the statutory sentencing factors, it is clear that a noncustodial sentence is sufficient.

Honorable Katherine B. Forrest                                September 2, 2014
United States District Judge                                             Page 7

   Re: <u>United States v. Joseph L. Junkovic</u>
    S1 13 Cr. 682 (KBF)

## A. <u>The Applicable Guideline's Lack of Historical or Empirical Basis</u>

   In the wake of *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court has distinguished between Sentencing Guidelines which were based on reviews of past sentencing practices and empirical studies, versus those that lack such bases. *See Kimbrough*, 552 U.S. at 109; *see also Rita v. United States*, 551 U.S. 338 (2007). The Court has reasoned that if a particular Guideline was originally based on past sentencing practices, and revised in response to sentencing data and other research, then it seems fair to assume that recommendations truly embody the statutory goals of § 3553(a). *See Rita*, 551 U.S. at 349. Conversely, when a Guideline is not developed according to this practice, there is less reason to believe that it embodies the statutory objectives and deserves deference, even in a mine-run case. *Kimbrough*, 552 U.S. at 109.

   The Guidelines involved in this case – U.S.S.G. § 2B1.1 – is an example of one that is not based on historical sentencing practices or research. Unlike many other guidelines, § 2B1.1 was not even originally intended as a codification of past sentencing practices. It was instead written with the goal of increasing the severity of sentences over historic levels. According to the Sentencing Commission's research, so-called white collar offenders were historically more likely to receive probationary sentences. The Guidelines sought to modify this practice by making a greater number of white-collar offenders subject to prison. *See* U.S.S.C., *Fifteen Years of Guidelines Sentencing* vi-vii (Nov. 2004) ("large proportion of fraud . . . offenders received simple probation [pre-Guidelines] . . . . [T]he guidelines were written to reduce the availability of probation and to ensure a short but definite period of confinement for a larger percentage of these 'white collar' cases, both to ensure proportionate punishment and to achieve adequate deterrence."); *id.* at 44 ("[White collar] offenders historically were likely to receive simple probation, but under the guidelines they increasingly are subject to intermediate sanctions and imprisonment."); *id.* at 56-57 (reporting "striking" shift away from probation for economic offenses). The Guideline is thus not in accordance with historical sentencing practices.

   Nor is there persuasive evidence that this was well-reasoned change. The Commission's deviation from past practices in drafting § 2B1.1 was a conscious, but largely unexplained decision: proffered reasons were to correct for past under-punishment of certain economic offenses; to make white-collar sentences "proportionate" to sentences for drug and violent crimes; and to effectuate greater deterrence. *See id.* at 55-56. But these stated reasons do not inevitably support more prison for theft and fraud offenders.[2] They also seem to contravene the statutory directives that sentences be sufficient but not greater than

---

[2] If proportionate punishment were the goal, the Commission could have chosen to recommend alternatives to incarceration or lower prison sentences in a greater number of non-white collar cases. With recent changes to the Guidelines, the current Attorney General's comments on mandatory-minimums, and Congressional movement to address mass incarceration, there appears to be growing recognition of the benefits of alternatives to prison for all types of offenders.

Honorable Katherine B. Forrest                                    September 2, 2014
United States District Judge                                              Page 8

Re: <u>United States v. Joseph L. Junkovic</u>
    S1 13 Cr. 682 (KBF)

necessary, 18 U.S.C. § 3553(a), and that a sentence other than prison be imposed on the
"first offender who has not been convicted of a crime of violence or an otherwise serious
offense," 28 U.S.C. § 994(j).

There is further no clear evidence that more severe sentences, or the more frequent
imposition of prison, actually provides for greater general deterrence of crime. Although
having a system of punishment exerts a deterrent effect, there is no consistent evidence that
marginally greater sentences effectuate marginally greater deterrence: "Imaginable increases
in severity of punishments do not yield significant (if any) marginal deterrent effects."
Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Justice: A Review of Research
28-29 (2006) (summarizing finding of three National Academy of Sciences panels and "every
major survey of the evidence"); *see also* Francis T. Cullen, et al., *Prisons Do Not Reduce
Recidivism: The High Cost of Ignoring Science*, 91 The Prison Journal 48S (2011) (surveying
research which yields evidence that imprisonment tends to increase rather than reduce
recidivism). Anecdotally, one hardly gets the impression the country has seen a massive
decrease in financial fraud and federal white-collar crime following the massive increase in
imprisonment instituted under the Guidelines.[3]

On an individual level, the Commission's own research does not support its
deterrence argument. The Commission has found that individuals sentenced to straight
probation have the lowest overall recidivism rates, while those sentenced to prison are
generally more likely to re-offend.[4] *See* U.S.S.C., *Measuring Recidivism: The Criminal History
Computation of the Federal Sentencing Guidelines* 13 (May 2004). This appears to hold true for
white-collar offenders as well. *See* David Weisburg et al., *Specific Deterrence in a Sample of
Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) (finding prison terms had
no specific deterrent effect on white-collar offenders).

Another problem with the Guideline is that over time it has only moved further from
historical sentencing practices and the stated original intent of the Commission. The
Commission's aim was reportedly "short but definite" prison terms. Since 1987, however,
recommended sentences under the Guideline have been steadily increased, often with little
justification. Moreover, the fact that the same crime can supposedly warrant such different

---

[3] Increasing the severity of § 2B1.1 has certainly done nothing to lower the number of federal theft
and fraud offenders. According to the Sentencing Commission's Guideline Application Frequencies,
5,189 offenders were sentenced under the Guideline in 2002; 8,123 were sentenced in 2008; and
8,410 were sentenced in 2013. *See* U.S.S.C., Guideline Application Frequencies, *available at*
www.ussc.gov/research-and-publications.

[4] Whatever "scared straight" benefits prison provides seem more than offset by the negative effects
which make future crime more likely. These include separation from law-abiding family members or
significant others and other prosocial influences; disruption of employment and housing; exposure
to more serious offenders; and immersion in a violent, dehumanizing environment.

Re: <u>United States v. Joseph L. Junkovic</u>
    **S1 13 Cr. 682 (KBF)**

penalties over time undercuts the claim that the Guideline yields rational sentencing recommendations.

While this Court is required to consider the advisory Sentencing Guidelines, § 2B1.1's recommendation does not deserve deference. The harsh sentences recommended under this Guideline are not based on history or evidence.

## B. A Noncustodial Sentence Provides "Just Punishment"

Beyond the advisory Guidelines, the Court must consider all of the statutory sentencing factors set forth in § 3553(a), detailed above. These factors can be roughly broken down into categories including retribution or "just punishment"; the need to provide adequate deterrence; the need for protection of the public; and rehabilitation. Within these categories, a court considers factors such as the circumstances surrounding the offense, a person's history and characteristics, sentences imposed in similar cases, the types of sentences available, and the need to provide restitution. Considering all of these factors together, the Court should impose a noncustodial sentence.

First, as to "just punishment," the Court should consider the whole range of punishments Mr. Junkovic will face aside from any imprisonment. This conviction carries a myriad of punitive consequences apart from any period of supervision or custody. Even though he and his parents have worked diligently for decades, the family's resources are modest. Both of Mr. Junkovic's parents are now retired. Mr. Junkovic is responsible for helping to support them and other relatives they have remaining in the former Yugoslavia, including Luke's extended family. After a period of difficulty around the time of his arrest, Mr. Junkovic has found relatively steady employment. However his pay works out to less than $20,000 a year. As a result of this conviction, he will now owe restitution and forfeiture together totaling over $720,000. For as long as he is under court supervision, he will be compelled to make monthly payments towards this obligation. After that, it will be a judgment against him which he is likely to carry far into the future.

At the same time that he has incurred this massive financial obligation, Mr. Junkovic has lost access to many of the best, well-paying jobs because of his criminal conviction. He is now a convicted felon. Those working in the criminal justice system may become desensitized to this label, but it carries a multitude of social and civil handicaps. This conviction will likely be a powerful impediment to Mr. Junkovic finding future employment, particularly in the field of accounting. The conviction will prevent him from accessing certain public benefits which he or his parents may need in the future. It will certainly be a continuing source of shame and humiliation.

The Court should also recognize that even noncustodial supervision is punitive: it can be a daily infringement on a person's basic freedom and autonomy. As the Supreme Court has described,

Re: <u>United States v. Joseph L. Junkovic</u>
    <u>S1 13 Cr. 682 (KBF)</u>

> Probationers may not leave the judicial district, move, or change jobs without
> notifying, and in some cases receiving permission from, their probation officer
> or the court. They must report regularly to their probation officer, permit
> unannounced visits to their homes, refrain from associating with any person
> convicted of a felony, and refrain from excessive drinking.

*Gall v. United States*, 552 U.S. 38, 48 (2007). Individuals under supervision can be subject to
additional conditions, including financial restrictions, search conditions, home confinement,
electronic monitoring and community service requirements. Some of these conditions and
restrictions may sound minor in the abstract, but they are not to the people living with them
every day. The Supreme Court has affirmed the punitive character of such a sentence, which
"substantially restrict[s]" the liberty of an individual. *Id.*

In terms of how much punishment is "just," the Court should consider that this is
Mr. Junkovic's first criminal offense and that he has exhibited sincere remorse for his
actions. He made a mistake. He admits that he did something wrong. He recognizes that he
must not do anything similar in the future. Family and friends who have written to the Court
comment on Mr. Junkovic's genuine regret for his actions. His mother writes that Joseph has
expressed that he is "ashamed of himself" and that he feels that his failure to use better
judgment "has ruined his own life." ***Exhibit A***. Christopher Booth and Salvatore Dileo
both attest to the sincere remorse they have witnessed in their friend. ***Exhibit C & G***.

Throughout its research, the Sentencing Commission has articulated important
factors bearing on a defendant's culpability, including whether an offense involved violence,
the magnitude of injury to the victim, a defendant's role in the offense and her acceptance of
responsibility. *See* U.S.S.C., *Recidivism and the "First Offender"* 9-10 (May 2004). Defendants
who are facing their first offense, whose crimes do not involve violence, who cause no
bodily injury to a victim, who have a reduced role in the offense, and who accept
responsibility for their acts are generally less culpable. *Id.* An offender who meets four of
these criteria, like Mr. Junkovic, deserves lesser punishments. *See id.*

## C. A Noncustodial Sentence Will Achieve Deterrence & Protection of the Public

Next, the Court should recognize that a noncustodial sentence will achieve sufficient
deterrence and protection of the public. On an individual level, Mr. Junkovic has already
been deterred.  He has been upset and shamed by his experiences in connection with this
case. He has never been arrested for or convicted of a crime before. He is remorseful for
what he has done and there is little reason to think she will commit a crime in the future.

Mr. Junkovic also has several personal characteristics which correlate with lower
recidivism rates, including his age (offenders over age 50 have a recidivism rate of only
9.5%); the fact that this is his first offense; his history of steady employment; his college
degree; his absence of any prior drug use; and the nature of the offense. *See* U.S.S.C.,

Re: <u>United States v. Joseph L. Junkovic</u>
S1 13 Cr. 682 (KBF)

*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12-13 (May 2004). He is a person whose general good conduct over the first 45 years of his life demonstrates that his criminal actions were an aberration, which will not be repeated.

Regarding protection of the public, Mr. Junkovic is not a person who needs to be imprisoned or otherwise incapacitated in the interests of public safety. His lack of a criminal record, long history of employment and community involvement, and stellar performance while under court supervision pending plea and sentencing all demonstrate that he can live safely and productively in society.

## D. <u>Restitution, Rehabilitation & Additional Factors That Favor a Noncustodial Sentence</u>

The Court should consider a few final factors as to why a noncustodial sentence best achieves the statutory aims. First, if any purpose of this prosecution is to repair the damage done to the victim in this case – the New York State Department of Health, which overpaid Mr. Junkovic – that goal will be best accomplished by permitting Mr. Junkovic to remain in the community and work. He will have virtually no ability to make restitution payments while incarcerated and by going to prison he will lose his job and be forced to find another one when he is released. This will further delay his ability to begin restitution.

Imprisonment will do nothing to further Mr. Junkovic's rehabilitation. Indeed, the statute specifically disclaims imprisonment as a means of accomplishing rehabilitation, *see* 28 U.S.C. § 994(k), and there are no obvious custodial programs that would benefit Mr. Junkovic or improve his ability to follow the law in the future. Incarceration will also be detrimental to Mr. Junkovic's health. As noted in the PSR, Mr. Junkovic suffers from hypertension and gout.

Finally, the Court should consider the care and assistance Mr. Junkovic provides his aging parents. His is an exceedingly close family. They have traveled from Montenegro, to Italy, to the Bronx together. Mr. Junkovic has always been by his parents. They raised him and now, as they age, he is returning that care and love by helping them. Both parents suffer from diabetes and heart disease. PSR ¶ 55. Luke has had both of his knees replaced, while Lula has had hip replacement surgery, hindering her mobility. *Id.* When Luke's heart failed about eight years ago, Joseph physically carried him part of the way to the hospital. ***Exhibit B.*** Joseph takes both his mother and father to all of their doctors' appointments and helps them with many other day-to-day activities, including grocery shopping, cleaning and cooking. As his father writes, Joseph is the "center" of their household. ***Exhibit B.*** Luke and Lula are the people who will suffer the most if Joseph Junkovic is incarcerated.

Honorable Katherine B. Forrest
United States District Judge

September 2, 2014
Page 12

     **Re: <u>United States v. Joseph L. Junkovic</u>**
        **S1 13 Cr. 682 (KBF)**

## VI.  CONCLUSION

     If Mr. Junkovic could go back and change his actions, he would. He is ashamed and embarrassed by his offense and conviction. He will now be forever labeled a felon. He is facing substantial financial penalties that will be a drain on whatever money he can earn in the future. At the same time, his long record of work and service show that he can continue to contribute to his community in a positive way. For all of the reasons discussed above, a noncustodial sentence would be sufficient in this case.

                Respectfully submitted,

                Sarah Baumgartel, Esq.
                Assistant Federal Defender
                Tel: (212) 417-8772

# EXHIBIT A

LULA JUNKOVIC

BRONX, NY 10469

June 17, 2014

Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

To The Honorable Katherine B. Forrest:

My name is Lula Junkovic and I am married and the mother of Joseph Junkovic, my only child.  My husband Luke Junkovic and I came from former communist Yugoslavia to the United States of America to give our son Joseph a better life.  My husband and I started working the week that we came here.  The both of us worked maintenance jobs and the both of us are currently retired.  Currently my husband and I go to church on a daily basis.  I am writing this letter knowing that Joseph has plead guilty to a felony offense.

Growing up, Joseph did not have very much and he was very frail.  He had pneumonia twice and also a fractured skull.  He spent most of his early years in the hospital.  Both his father and I instilled both religion and family values into his daily life.  We eat our meals together and pray on a daily basis.  My husband and I both have various health issues:  Arthritis, heart disease and diabetes.  Joseph takes us to each of our appointments and makes sure that we follow the doctors prescribed methods of treatment.  He takes the both of us shopping for food and clothes and often cooks for us.  When we went to Montenegro to visit relatives he would insist on coming and returning with us so that he could assist us with our luggage and drive and make our visiting experience more pleasant.  No one could ask for a better son.  My son is also very close with the rest of our immediate family.  He socializes and spends holidays with them.  He is the only member of our family that goes out of his way to call everyone for their birthday, although they might forget his birthday.

Joseph goes to church on at least a weekly basis and is involved with a lot of charity work.  For example my son and a few of his friends heard that the roof of the rectory of St. Lucy's Church was leaking and the pastor could not sleep when it rained, so they replaced the roof of the rectory.  My son is friends with a twelve year old boy with autism.  Joseph has been a part of this boys life since the boy was one.  The boys parents gave up on the boy and told Joseph that the boy could not speak or hear.  Joseph said that it was impossible so he would spend weekends at this boys

house and when he was about four my son heard the boy say "right here." When he told the parents they said that's impossible. A couple of weeks later the boy started to act up with his parents and the parents called my son and asked him to come over and my son went. When my son knocked on the door the boys entire family heard the boy scream "quick open the door Joe is hear." My son Joseph has always been a giver and at times I discuss this with my husband to a fault because people take advantage of him. When we tell him he is being taken advantage of he always says that he has enough and there are people out there less fortunate than he is.

My son started working at nine years old. He paid for most of his education himself. I recall when he finished school, he was so proud because although he had no money he had a college degree and no debts. He had achieved what most people in the community we lived in looked to achieve but could not. To this day he goes to Our Lady of Mt. Carmen Church in Belmont. Most merchants and residents still know him. Over twenty years ago Joseph started to work with screening for those uninsured, and underserved for breast cancer. He seemed alive because he was helping people in the Bronx. Over the next twenty something years he got involved in all programs in the metropolitan area and upstate. My husband and I would often tell him that he should not spread himself too thin because he would often work over twenty hours a day and we did not want him to get sick but he would tell us that he is fine and he was happy and alive because he was helping people.

Our son informed us back in July of 2009 that he was being investigated and we were all in shock. He has been living hell since then. He is practically getting by since 2012. It appears that his spirit died with him as well since all this has taken place. Joseph has informed both my husband and I that he is ashamed of himself, because of what he has did to the both of us and because he has ruined his own life. He feels that he should have used better judgment, however he did not. I ask your Honor to be merciful on our son during sentencing because we do need him at the house and him being away would affect both my husband and my life. Joseph accepts responsibility for his actions and will accept the sentencing decision that your honor declares.


Thank you for your consideration.

*Lula Junkovic*
Lula Junkovic

# EXHIBIT B

LUKE JUNKOVIC



BRONX, NY 10469

June 17, 2014

Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

To The Honorable Katherine B. Forrest:

My name is Luke Junkovic and I am married and the father of Joseph Junkovic, my only child.  I decided to move my family from former communist Yugoslavia so that we could have a better life.  I made my decision in 1969 after an earthquake, as I was passing my son to my wife through the walls of the house as they began to open as the earthquake was going on.   We came to the United States in debt and I often wanted to return but I stayed here so that eventually we would all have a better life. My son would observe this at an early age became very determined and obtained a work ethic.  I often worked two jobs to support my family here and my mother, father and two sisters and their families back home.  I am catholic and god fearing.  I go to church daily with my wife.  I am writing this letter of support for my son knowing that he has pleaded guilty to a felony.

I raised my son to be a god fearing, hard working and moral and ethical human.  I often feel guilty because Joseph never had a childhood like the rest of the children that he grew up with did.  He started to work at the age of nine and I recall my great aunt had died and my father called me up to inform me of the news.  He told me he needed money to bury her and I did not have much, upon hearing about this my son gave me his savings to send back to my father to bury his aunt.  I taught my son to be a free thinker, I recall when he was going to fourth grade he was enrolled in both public school and private school for that year and I asked him where he wanted to go and he asked my advice and I told him private school was better.  He replied how much did it cost and could we afford it and I replied yes and he latter replied he would go and if it was too hard he would go to public school.  By fifth grade he was paying his own tuition and at times we would help him with other costs he might have.  He struggled up until the seventh grade because neither my wife or I could help him out with vocabulary.  By seventh grade he scored in the top one percent in vocabulary.  He worked part time through high school and by his third year of college was working full time and going to school full time.  Both my wife and I were very proud of him because he was the only member in both our families that had

earned a college degree. He would often speak to other immigrants younger than him and help them with their studies. He would go to employment offices and complete employment applications for other community residents. Joseph just liked helping people.

My son loves both my wife and I very much. He does all he can for us. About eight years ago I was having congestive heart failure and I told my wife to call my son because I was dying. My son came home put me on his shoulder and took me to the emergency room since then he has been coming to each and every doctor appointment that I had and he does the same thing with his mother. While at the hospital he stayed with me the entire time. He is the same way with his mother.

About fifteen years ago my son approached me and he asked me if I thought it was a good idea to open a company to help people with no insurance get screened for cancer I replied if I knew any better for myself I would not work as a laborer. I asked him if he could support himself doing this and he replied that the money to live would eventually come. I never saw my son as alive as he was when he worked with these cancer programs helping people who do not have. About five years ago he informed both me and my wife that he was being investigated and we were both shocked because our son was never that type of person.

Through the time of the investigation he continued to work on these programs at times in excess of twenty hours a day seven days a week. I recall one Sunday he had dinner with us and he told my wife he was going to work and he did not return until the following Friday. During Easter he informed both my wife and I that he used poor judgement and he was pleading guilty for over billing his time worked.

Your Honor my son is the center of our household and my wife and I need him for daily tasks at the house such as cooking and cleaning. He drives us to doctor appointments because parking is generally bad and both my wife and I suffer from Arthritis I had two knee replacements and she had a hip replacement. He carries grocery for the house and cooks. He will drive us to friends houses that live far away. He writes our bills for us because I have four years of schooling and my wife has less. Joseph accepts responsibility for his actions and accepts the sentencing decision you declare. Your Honor America is the land of second chances and new beginnings please have mercy on my son he made a mistake and knowing him this will never happen again. Please give him a second chance for me and my wife we really need him now more than every.

Thank you for your consideration.

*Luke Junkovic*

Luke Junkovic

# EXHIBIT C

**CHRISTOPHER BOOTH**

 New York

June 16, 2014

The Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Dear Judge Forrest:

I am writing this letter on behalf of my friend Joseph Junkovic who has pleaded guilty to a serious offense and will be sentenced by you. I have known Joe since we were children growing up in the same Belmont neighborhood in the Bronx. We had many of the same friends, associations and attended the same college. I am now 49 years old and he is still my friend.

I would like you to know that Joe has been a loyal and supportive family member and a helpful friend to many. He was and is a good son who was especially close and remains so to his parents. Many of us are worried that his parent's health including their diabetes, heart and arthritis conditions will decline further from the heartbreak they are experiencing. Joe was raised by a family that was not affluent. When he was younger he was one of the few local Albanian Americans I knew who attended college. He used his education and skills to help people in the community, mostly immigrants by reading and interpreting documents for those who could not read English or lacked knowledge of legal matters. He did not charge people for doing this and did it willingly for anyone he came across who needed help.

Since his arrest in this case, Joe has expressed great remorse for his actions to me. He realizes that the choices he made put him in this position and harmed his family and himself. He is truly sorry. I know Joe will do all that he can to put this bad chapter in his life behind him and live a better life. He has the character, the will and a support network including friends who are there for him no matter what. I can tell the court that the Joseph Junkovic I know will not commit crimes in the future and that he is capable of complete rehabilitation.

Your Honor has a difficult task to impose a sentence that provides punishment but that is fair for the individual before the court. It is my opinion that Joe would not let the court and society down if he is given a second chance. As someone who knows the true person of Joseph Junkovic I ask that the court considers mercy in this sentence. Having a felony criminal conviction on his record will make the rest of his life a struggle and is a serious penalty in itself. I would ask the court to consider a non-jail sentence for a man who is fully capable of doing the right thing the rest of the way.

Thank you,
Christopher Booth

# EXHIBIT D

May 29, 2014


Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

To The Honorable Katherine B Forrest:

I have known Joseph Junkovic personally for 30+ years, with him being a staple in our family since I was a little girl.  He was friends with my older brother so I always looked up to him as someone who always did the right thing for his family, my family and the community.  Growing up, he would always take time to talk to me and mentor me on my education, coaching me to make the right choices to make available to myself the most opportunity; understanding that we faced the same challenges being from immigrant families.

My memories of him date back to being involved with him at charity fundraising events, being part of the organization committee to pull together like minded individuals with the common goal to raise money to make improvements on the community and personal lives of many people who needed help. I remember him always working with my father to help raise funds and awareness for the charitable event, from restoring a rundown church in some adjoining neighborhood to helping raise money for victims of an earthquake that devastated the central region of Italy.

To this day, with my father now deceased for 12+ years, he still visits my family, and we exchange fond memories of days past.  If my father was still alive, he would be able to express just how much of an impact Joseph had on his life, and vice versa.

My familiarity of Joseph is that he is always supportive and hardworking, taking time to help someone in need, trying to make things easier for those less fortunate.  And that's where the disconnect is for me. After he shared with me his current situation before the courts, I struggle to believe that this person before you is the same person I've known for nearly my entire life.

As I told him, I convey to you now – I know he needs to own up for what he's done; for every action there is a consequence.  What I do ask is that the courts consider the entire scope of his life, all his good merits, his good intentions, and positive influence to many people, when making a determination of sentencing.  He is a kind-hearted person that knows he needs to make things right – always – including at this point in his life.


Thank you for your consideration.

Anna Pacitto

# EXHIBIT E

Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007                                         June 17, 2014

To the Honorable Katherine B. Forrest:

I am pleased to write this letter of support for Joseph Junkovic whom I have known since 2008.

As Executive Director of Continuing Education at the School of Visual Arts since 1987, and an active member of the Italian-American community in New York, having served on a variety of advisory board committees, I have collaborated with Joseph Junkovic on numerous occasions and have found that he has a remarkable talent for analyzing problems and then synthesizing them with concision to the effective understanding of his peers.

When I met Joseph and his parents, I was immediately impressed with his many accomplishments within the community. Soon after our initial meeting, I invited him to participate in many of the various fundraising opportunities I was developing. Without hesitation, Joseph happily joined my efforts.

As a former member of the Italian-American Network management team, whose mission is to celebrate via family-friendly television programming the art, culture, entertainment, fashion, history, and travel of Italians, I enlisted Joseph to assist in garnering the wholehearted support of national and local grass roots Italian-American organizations. His expertise was also valued when I served for the Nations of New York (a subcommittee of the NYC2012 Olympic Committee).

It is worth noting that Joseph's sense of service to the community, in what activities he feels are significant, is enviable. With his knowledge of politics, finance and service, Joseph has been able to lend his support to various factions of the Italian-American community, specifically those who are underserved. Joseph's command of the formulation and implementation of concepts and ideas has not only earned him the respect of his colleagues, but my family, as well.

During a visit to New Orleans in 2008, Joseph was instrumental in coordinating a large group of Italian-Americans from Bronx, NY to serve at St. Vincent de Paul's Ozanam Inn–a hospice for homeless men; giving food to the needy is a St. Joseph's Day custom. His irrefutable professionalism has been a constant since I met him and his family on St. Joseph Day, March 2008.

Such qualities impel me to request that Joseph Junkovic's case be resolved with understanding and compassion so that his work in the community may go uninterrupted.

I thank you in advance for your attention to Joseph Junkovic's particular set of circumstances for which he has accepted responsibility, and is markedly remorseful for his conduct.

Sincerely,

Joseph Cipri

# EXHIBIT F



Fr. Nikolin Pergjini ◊ ▓▓▓▓▓▓▓ ◊ Bronx, New York 10467 ◊ ▓▓▓▓▓▓▓

June 17 , 2014

To Whom It May Concern

I, Nikolin Pergjini a citizen of the United States, and Roman Catholic priest of archdiocese of New York assigned pastor of St. Lucy's Parish located in the Bronx, would like to write on behalf of Mr. Joseph Junkovic.

I am writing this letter knowing that Mr. Junkovic has pleaded guilty to a felony offense. For more than twenty years I have come to know Mr. Joseph Junkovic personally as well as his family. I do remember my first assignment as a young priest at Our Lady Mount Carmel, Bronx where Joseph used to attend Mass on Sundays with his parents. Since then I have come to know him as an honest and hard working young man. He has been a faithful parishioner who generously gave to the church. I do remember that when I needed help to assist the needy of my parish or other ministries I did not hesitate to make my requests to him knowing that he will respond immediately. And he was ready to help me then and still is today. During these years of my experiences in different parishes he has followed me and I always kept in touch with him and his family. And this confirmed his honesty and integrity as a faithful friend and parishioner. And now my parish being very close to his house I am thankful and grateful to have him and his family not only as friends but as generous and faithful parishioners. My experience with Joseph was not and it is not simply shaking hands after the Mass as I usually do to every one. It is not that kind of knowledge that I have for him. I have come to know him and his parents from inside as humble and honest people. I still faithfully visit him and his parents treasuring our friendship and their help to the Church. We share our concerns and hopes. I am aware that Joseph accepts responsibility for his actions and will accept the sentencing decision of the Judge. On my part as a priest and friend of Joseph and his family, I support them with my spiritual assistance and encourage him not to loose hope. I firmly believe that Mr. Joseph Junkovic willingly and joyfully wants to commit his life for the good of his family and our society. I am convinced that he has learned a lesson from his past experience.

If you have any questions regarding this information, please do not hesitate to contact me.

Sincerely,

Father. Nikolin Pergjini

# EXHIBIT G

SALVATORE DILEO

 NY 10706

June 17, 2014

Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

To The Honorable Katherine B. Forrest:

My name is Salvatore Dileo and I am a married and a father to two boys.  I have
known Joseph Junkovic since 1989.  We met through mutual friends at a house
party.  We became instant friends because we have similar upbringings.  Joseph
immigrated with his parents from former communist Yugoslavia in 1970.  He and
his parents like my parents immigrated from Europe.  They came here for a better
life.  Joseph worked his way through college like I did.  He knew that hard work
would bring him ahead in life.  I saw this as a positive in his personality.  Just like me
he never took anything for granted.  He was humbled by his simple upbringing.

Joseph has been extremely grateful to his parents.  I always loved how honorable
and respectful he has been with his parents.  This bond with his parents has kept
him in the same house with them.  He comes from a close knit family with aunts,
uncles and cousins who love him.  He is generous, courteous and respectful at all
times.

Joseph was the only friend whom I confided in with my own fathers sickness.  My
father was diagnosed with dementia/ alzhiemers disease at an early age of 62.  I was
devastated.  My mom and I took care of him.  Joseph was the one from my group of
friends that was concerned about his health and always asked about him and visited
him and talk to him and my mom.  On a Saturday morning, my father woke up and
did not look good  I went over to hug and comfort him and he immediately had a
stroke and heart attack in my arms.  I panicked, cried and screamed after I called
911, I then called Joseph.  He was at my house in minutes and he does was he does
best he took control of the situation and calmed both my mom and me down.  This is
who Joseph Junkovic is and I will never forget the support he gave us.

Joseph also helped a friend of our who had breast cancer.  She was a young 30 years
old when she died.  He would speak to her for hours and give her hope.  He was
there for her when she needed friends the most.

Joseph has been my good friend for years.  We have grown, laughed and cried together.  He appeared unannounced at my first date with my wife.  He was at my grand parents and fathers funeral.  He was at the birth of my kids.  He has always listened and given me advice.

When he informed me of his legal issues I was in shock.  I was in shock because I said to myself that he could not of did what he is being accused of.  As I confided in him he confided in me and he is embarrassed by his actions.  He is embarrassed that he has let down his close family and friends.  The thing I find amazing is that he has not stopped being my friend and at times when I discuss issues I am having it's almost as if he has no problems.

When sentencing Joseph, I ask the courts to consider the person who has always been selfless with his parents, relatives friends as well as the communities that he has been a part of.

Thank you for your consideration.

Salvatore Dileo

# EXHIBIT H

May 29, 2014


Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

To The Honorable Katherine B Forrest:

I have known Joseph Junkovic personally for 30+ years, growing up with him throughout our teenage and adult years. During that time, I have always known Joseph to be a kind, giving and loving person. He has strong family values and has always tried to do the right thing.

We met when I was about 9 years old; he started out being friends with my older brother. He would come over to dinner after school and we would play stick ball on the street.  As we grew up, we worked together in the local Arthur Avenue Market, selling produce and other wares to the local families in the neighborhood.  While we were "neighborhood kids", we learned the core values of work and family, believing if you put your heart into anything you do you could be successful.  It wasn't easy growing up as children of immigrant parents; we worked long hard hours; but we had fun every step of the way. We understood that all the hard work and effort would result in our development as productive, successful and contributing men, providing a base for our futures, our families, people in our communities and beyond.

I understand that Court will only view him based on his actions before you, however I ask the Court to consider his life, too.  He has strong religious beliefs as is demonstrated by his regular attendance and participation in local church events including community fund raising for the annual religious festivals to raise money for the church to support community and children outreach programs.

As a divorced father working a blue collar job making ends meet and spending much of my time ensuring my children didn't feel the effects of my personal situation, he has always shown a kind and giving side to me and my girls. He spent many weekends playing in the park and building snowmen with my girls, and still today calls my youngest daughter "my little Britney".

Personally I struggle to understand how he finds himself in this situation as the person I've known most of my life is very different from that which you see before you. Joseph has shared with me details of his felony offense, and I know that he must own up to the consequences of his actions. But I ask - on behalf of myself and others - to consider not only the action before the Court, but for all his actions in his life that warrant merit, as well.

Thank you for your consideration.

*Biaggio Settembre*

Biaggio Settembre

# EXHIBIT I



Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United Sates Courthouse
500 Pearl Street
New York, N.Y., 10007

Your Honour,

My name is Howard Barshop. I have known Joseph Junkovic for nearly 10 years and easily consider him one of my closest friends. Many a time, Joseph has joined my family and me for dinner and has thus met several of my family members, including my parents, sister and her 4 year old twin daughters. Joseph is a good man. Over the last 10 years he has consistently demonstrated, trust, honour and integrity. He has been there for me and my family during times of need and times of shine. He gets along well with my sister and has been there for each of her twins last 4 birthdays. He would come bearing gifts, balloons, etc… one year he even came as the clown. I remember last year very clearly when I lost both of my parents within 3 months, and he was there to see my sister and me through this trying time. Needless to say there are only a couple people that I can put in the category Joseph is in with me and my Family. I have also been able to participate in his families celebrations as well. The way he runs around and cooks cleans and cares for his parents is exactly the way I cared for mine. He truly is a warm hearted and nurturing man.

In the neighbourhood, Joseph is the kind of a person that everyone is delighted to see. For some reason everyone feels at ease around him. Strangers would mistake him for the mayor seeing the way people come up to him to say hi all over the streets. He is always eager to help everyone regardless of their status or relationship with him. He is the kind of a person you call at 2am to help you fix your flat tire and he comes straight away.

Lastly, I have had numerous conversations with Joseph about his transgressions. I know he has come to terms with his actions and it ready to accept your decision.

Thank you for taking your time in reading this letter. Kindly consider his situation as you make your decision.

Howard C. Barshop
EVP Operations & Facilities
completely bare spa
███████████
N.Y., N.Y. 10003
███████████

# EXHIBIT J

July 9, 2014

Dear Judge Forrest:

I am writing to attest to the character, loyalty and integrity of Joseph Junkovic.  I knew Mr. Junkovic through my former work as Director of the New York State Department of Health's (NYSDOH) Cancer Services Program (CSP) from 1996 – 2000 and in a related role with the American Cancer Society from 2000 - 2009.

During those years Mr. Junkovic held several contracts with NYSDOH CSP for and on behalf of local coalitions engaged in cancer screening and community outreach activities.  Mr. Junkovic compiled billing data representing thousands of clinical services provided by member agencies of these coalitions, submitted vouchers to the NYSDOH and promptly distributed payment for these services to hospitals and other health care providers.  Although I did not directly monitor his work, CSP staff who did so reported to me during the years I directed the program at NYSDOH.  I was never aware of any concerns about his honesty, ethics or business practices.  On the contrary, Mr. Junkovic was cited by the CSP in 2000 as a "Partner of Distinction" for his unstinting support of the coalitions with whom he worked.

I left my position at the NYSDOH in September 2000 to become Director of Breast Cancer Early Detection Programs for the American Cancer Society (ACS) in New York and New Jersey – a position I held until my retirement in 2009.  During those years the ACS coordinated several CSP cancer screening coalitions in New York's Capital, Hudson Valley and New York City metro regions.  I had general oversight, although not direct supervisory, responsibility for that work.  Mr. Junkovic held some of the CSP contracts for ACS and provided billing and reimbursement services for those coalitions. During that time, I was not aware of any issues or concerns about his honesty or integrity.

Although I have not had contact with Mr. Junkovic since 2009, during the previous 14 years I spoke with him frequently and met with him regarding the contracts several times each year.  I and others who worked with him knew that we could reach him, if

necessary, 24 hours a day, 7 days a week.  I was aware of many occasions when he worked around the clock to see that hospitals and doctors received prompt payment for their services.  I was shocked to learn of the charges against him.  They seemed entirely out of character for a man whom I believe to be honorable and who, in my experience, held himself to very high standards of professional integrity.  He was personally committed to the CSP's mission of saving lives from cancer, and his loyalty to the people and community coalitions with whom he worked was unquestioned.  I would trust Mr. Junkovic with my life.

Sincerely,

Eva Sciandra

Eva Sciandra